Sam DYER et ux., Appellants,

v.

Maxine Ellis HARDIN et vir, Appellees.

No. 6846.

Court of Civil Appeals of Texas.

Amarillo.

March 23, 1959.

Rehearing Denied April 20, 1959.

Simpson, Clayton & Fullingim, Amarillo, W. T. Link, Clarendon, for appellants.

Monning & Monning, Amarillo, William J. Lowe, Clarendon, for appellees.

PITTS, Chief Justice.

Appellees, Maxine Ellis Hardin, joined by her husband, W. K. Hardin, sued her uncle, appellant herein, Sam Dyer, together with his wife, Lula Dyer, seeking to impress a constructive trust upon and recover an undivided one-half interest in approximately 2,232 acres or 3½ described sections of land in Armstrong County, Texas, and certain described town lots with improvements thereon in Clarendon, Donley County, Texas. Appellees alleged in effect that on May 12, 1947, Maxine Ellis, then a single woman, at the request of her uncle, Sam Dyer, executed a deed in oral trust conveying her one-half undivided interest in the lands to her uncle, Sam Dyer, who owned the other undivided one-half interest therein and who by agreement between them would hold her one-half interest in trust for her for a period of 10 years upon the condition that he could use the said land but would pay off all indebtedness against her part of the land, which amounted to one-half of approximately $15,864, and pay her for the use thereof the sum of $1,000 each year or the total sum of $10,000 for the 10 year period, at the end of which period he, Sam Dyer, agreed to convey her one-half undivided interest in the land back to her; that near the end of the said 10 year period Maxine Ellis Hardin requested Sam Dyer to convey her one-half interest in the said land back to her in compliance with his promise so to do and upon his refusal to do so, she then being married, was joined by her husband in filing this suit. Appellees likewise therein sued appellants for an accounting for the proceeds from all sources from the said lands from the year 1942 to 1946, both inclusive and for an accounting of the revenues received by him from the farm land from 1947 to 1956, both inclusive, alleging that much of the Armstrong County land in question was farm land and further alleging that she had inherited her one-half undivided interest in the said lands here involved from her mother, Elizabeth Dyer Ellis, deceased, who was a sister of Sam Dyer, and from her grandmother,

Minnie Dyer, deceased, who was the mother of Sam Dyer, from whom Sam Dyer likewise inherited his undivided one-half interest in the said land; that her mother, Elizabeth Dyer Ellis and Sam Dyer being the only children and heirs of Minnie Dyer, deceased, and she being the only child and heir of her mother, Elizabeth Dyer Ellis, deceased, that her mother, Elizabeth Dyer Ellis, died intestate in April, 1946 and her grandmother, Minnie Dyer, died intestate in November, 1946, and that from 1942 through 1946 Sam Dyer, in whom she, her mother and grandmother had the utmost confidence, had managed and controlled all of the said land, collecting all of the revenues therefrom without having accounted for such during the said period of time.

On October 9, 1957, at a preliminary hearing, the trial court rendered a summary judgment upon appellants' motion for such together with depositions attached thereto, denying appellees any recovery for one-half interest in the Clarendon, Donley County, Texas, town lots and the improvements thereon as well as denying them any accounting of and recovery of one-half interest in the proceeds and revenues from any and all of the said lands from the year 1942 to 1956, both inclusive, to which summary judgment appellees timely excepted, and the trial court thereby likewise severed the remainder of the suit from the foregoing parts mentioned, that is, severed the controversy involving the Armstrong County lands, to be separately tried upon issues pleaded by the parties. The record reveals that such a summary judgment was again rendered by the trial court on April 2, 1958, to which appellees "in open court excepted and objected in a proper and timely manner." Upon the said remainder of the suit the said parties repleaded, joining issues with each other upon fourth amended pleadings filed involving the constructive trust and deed to the Armstrong County land, went to trial on April 15, 1958, before a jury on the matters there pleaded, including a plea of limitation filed by appellants, and a plea by appellees for judgment for the revenues collected from the said lands by appellants since May 12, 1957.

Upon three special issues submitted to the jury, without objections or exceptions from either party, the jury found in effect that prior to the preparation and execution of the deed in question by Maxine Ellis Hardin conveying the land in question to Sam Dyer, he (Sam Dyer) had agreed with her that he would reconvey to her the said land at the end of a 10 year period; that Maxine Ellis Hardin would not have executed such deed without Sam Dyer having previously made such an agreement with her; and that Maxine Ellis Hardin did not learn during the year 1952 that Sam Dyer would not reconvey to her the one-half interest in the said lands which she had previously conveyed to him, thus by such answer refuting appellants' plea of limitation. Thereafter both parties filed motions for judgment upon the jury verdict, but on June 19, 1958, the trial court overruled appellants' motion for judgment and rendered judgment based upon the jury verdict awarding an undivided one-half interest of the Armstrong County lands in question to Maxine Ellis Hardin as her separate property and likewise awarded to her and her husband, as against appellants, the revenues collected by appellants from the said lands since May 12, 1957, in the total sum of $7,961.52 and again making its summary judgment final denying appellees recovery of one-half interest in Clarendon, Donley County, town lots and the improvements thereon, with all costs adjudged against appellants.

Appellants have perfected an appeal from the judgment rendered and have presented 19 lengthy points of error, each of which will have our consideration here but not in the order presented.

It may be well to observe here that after Maxine Ellis' mother died, her uncle, Sam Dyer, and wife, Lula Dyer, became more attached to Maxine Ellis and seemed to treat her like an own child since they had no children of their own. Maxine Ellis was

then 26 years of age and had a college education but seemed to have little business ability when Sam Dyer and wife began buying her nice presents and her Uncle Sam sent her away on several nice visits, one of which was to Washington, D. C. and another to New Orleans. After the death of her grandmother Maxine Ellis had inherited an undivided one-half interest in the lands in question and her Uncle Sam Dyer had inherited the other one-half undivided interest in the land. On or about December 21, 1946, Sam Dyer and his wife Lula Dyer and Maxine Ellis, all of whom lived in Clarendon, Texas, went together to Amarillo, Texas, where Colonel E. A. Simpson, an attorney at law and a good friend for many years to Sam Dyer and wife, drew separate wills for all three of them, which wills were on December 21, 1946, duly executed by them separately but all of the said wills were witnessed by the same witnesses. Maxine Ellis Hardin testified that the wills were drawn at the suggestion of her uncle, Sam Dyer, who determined what to put in them. Sam Dyer and wife, Lula Dyer, named each other as primary beneficiaries in their respective wills with Maxine Ellis named secondarily as a beneficiary of each of them in case she survived the named primary beneficiary. Maxine Ellis named her uncle, Sam Dyer, as the primary beneficiary in her will, her aunt, Lula Dyer, as a secondary beneficiary if she survived both Sam Dyer and Maxine Ellis, but in case both Sam Dyer and Lula Dyer preceded her in death, in that event she named her father, Dr. T. H. Ellis, who later died on December 24, 1956, as the sole beneficiary. Thereafter only a few days before May 12, 1947, Sam Dyer and Maxine Ellis went back to Amarillo to see Col. E. A. Simpson about drawing the deed here involved. Col. Simpson told Maxine Ellis in substance that the consideration for the land described in the deed was not enough value for the land therein described and she had better get her own lawyer to pass on the matter for her since he was representing her uncle,

Sam Dyer, but she declined to get another lawyer to represent her. At the trial Maxine Ellis Hardin testified in effect that immediately prior to the drawing and execution of the deed in question her uncle, Sam Dyer, had several conversations with her about her deeding her undivided one-half interest in the land to him for him to look after it for her and 10 years later he would deed it back to her; that her Uncle Sam told her it would be for her best interest to deed her part of the land to him only for the said period of time since he could keep the land together where he could look after all of it, care for her interest, pay off the debt against it since she could not do these things very well or at least as well as he could; that they agreed upon the consideration for such a deal previously herein shown and she relied on his statements and would not have deeded the land to him if he had not made these representations to her; and that she did not authorize Col. Simpson to draw any affidavit in connection with the deed for her to sign and did not know he was going to draw such affidavit until he later brought the deed and affidavit to Clarendon for her to sign; and that she had faith in her Uncle Sam who told her not to discuss their oral agreement about him deeding the land back to her after a 10 year period with anybody since that was a matter between them concerning their own business and for her not to say anything about it and she did not therefore tell Col. Simpson about that matter but she did not want another lawyer because, although she knew little about the value of the lands in question, she believed in her Uncle Sam. Sam Dyer testified that Maxine Ellis deeded her interest in the said land to him in fee simple and there was no agreement that he would deed it back to her at any time. However, Col. Simpson drew the deed in question and likewise drew an affidavit in support of the terms of the deed and took both of them to Clarendon, Texas, where Maxine Ellis executed both of them (the deed and affidavit) before a notary public on May 12, 1947, and the

affidavit was likewise signed by three witnesses. Both instruments are in evidence and Col. Simpson likewise testified concerning the drawing and execution of the deed and affidavit but he knew nothing about any trust agreement between the parties. However, he testified that he drew the deed and affidavit and said at the time "because if I draw these papers, if I can make it do so, I want it to stand up."

Appellants in their first point contend that reversible error was committed by the trial court because they pleaded limitation and their plea of limitation was good and judgment should have been rendered for them on that ground since the undisputed evidence shows that Maxine Ellis Hardin knew as early as the year 1952 that Sam Dyer would not reconvey the said land back to her. Appellant, Lula Dyer, gave testimony tending to show that Maxine Ellis Hardin knew as early as 1952 that Sam Dyer would not reconvey the land back to her, but Maxine Ellis Hardin controverted such claims as a witness and testified positively that she believed in her Uncle Sam and relied upon his promise for 10 years to the effect that he would deed the said land back to her at the end of the 10 year period and that she did not know the difference until in April, 1957, immediately before she filed this suit when Sam Dyer told her he would not deed the said land back to her. Sam Dyer's testimony supported that given by Maxine Ellis when he testified that he did not know Maxine Ellis wanted him to reconvey the land back to her until "two or three days before this law suit was filed" when she came and asked him if he would deed it back to her and he told her he would not. The jurors heard this testimony and found in answer to special issue No. 3 that Maxine Ellis Hardin did not know about this matter as early as 1952. The jurors were the sole judges of the credibility of the witnesses and the weight to be given their testimony and especially on controverted facts. There was sufficient evidence of probative value to support the jury finding here challenged.

That being true the jury's finding binds appellants and this court for which reason appellants' Point No. 1 is overruled.

Appellants' Point No. 2, briefed together with Point No. 1, charges reversible error was committed because the trial court refused to instruct a verdict for them because of their said limitation pleading and the evidence in support thereof, contending further that the evidence was insufficient to support the jury's negative answer to special issue No. 3 inquiring if Maxine Ellis Hardin learned during the year 1952 that Sam Dyer would not reconvey her interest in the land back to her, and that in any event the jury's answer thereto was contrary to the great weight and preponderance of the evidence. The controverted testimony on that issue has already been previously herein set out in considering Point 1. In determining the sufficiency of that evidence we must consider only the evidence and circumstances favorable to the jury findings and disregard all of that to the contrary, indulging every legitimate conclusion which tends to uphold the jury findings. Truelove v. Truelove, Tex.Civ. App., 266 S.W.2d 491 (writ refused). In considering the question of whether or not the jury finding is contrary to the great weight and preponderance of the evidence we must consider all of the evidence heard. In re King's Estate (King v. King), 150 Tex. 662, 244 S.W.2d 660; Tex.Civ.App., 248 S.W.2d 525. In applying these rules to the controverted facts presented we are of the opinion there was sufficient evidence to support the jury finding in question and that the jury finding was not against the great weight and preponderance of all of the evidence. We likewise observe that according to the record before us, such does not support the claims of appellants concerning an instructed verdict, since no motion for an instructed verdict was presented to the trial court by appellants and the trial court therefore did not refuse such. Appellants must have asked for an instructed verdict before they can be heard to complain about the failure to give such, but,

according to the record previously herein shown concerning appellants' claims for limitation, if they had asked for an instructed verdict upon such grounds, it would have been proper to overrule it. Therefore, for the reasons stated, appellants' Point 2 is overruled.

▪ In Point 3, appellants charge error was committed because the trial court refused to submit to the jury the issue of fraud as to future promises. Appellants made no request for the submission of such an issue and did not object or except to the charge because such issue was not submitted, consequently they have waived any right to complain about the matter now. Reed v. Beheler, Tex.Civ.App., 198 S.W. 2d 625; Dakan v. Humphreys, Tex.Civ. App., 190 S.W.2d 371 and other authorities there cited; Rule 279, Texas Rules of Civil Procedure and other authorities cited thereunder.

▪ In Point 3–A appellants contend that the trial court erred in submitting to the jury special issue No. 1 inquiring if Sam Dyer agreed with Maxine Ellis Hardin that he would reconvey the land in question back to her at the end of the 10 year period because such was based upon a violation of the parol evidence rule. As previously herein shown that issue was controverted by the evidence and for reasons already stated appellants have waived their right to now complain about such a matter because they did not object or except to the court's charge or complain in any manner about the submission of such an issue to the jury prior to the giving of an adverse answer against them by the jury to the issue. But, in any event, appellees pleaded constructive trust and fraud, thus giving them a right to offer parol evidence to establish such. Mills v. Gray, 147 Tex. 33, 210 S.W.2d 985; Dallas Farm Machinery Co. v. Reaves, Tex., 307 S.W.2d 233. For all of these reasons the trial court properly submitted special issue No. 1 and in any event appellants have waived their right

to complain about it now, for which reasons Point 3–A is overruled.

In Points 16, 17 and 18, appellants complain because the trial court rendered a money judgment against them for any of the revenues produced by the land in question since May, 1957, and briefed all three points together, contending first that until the trial court's judgment was rendered the parties were tenants in common and all of the revenues from the land belonged to Sam Dyer who occupied the said land; contending next that in any event they did not become tenants in common until May 12, 1957, and no demand having been made by Maxine Ellis Hardin for possession of any of the land, Sam Dyer was not required to account for the revenues from the land; and finally contending that a tenant in common is not required to account to his cotenant in common for revenues from the land until after demand for possession has been made by the other tenant and no such demand had been made by Maxine Ellis Hardin. No question has been raised about the amount of the money judgment since that matter had been conclusively established and the sources shown in the trial court's judgment.

▪ We have already shown herein the basis for appellees' recovery, the jury findings and the provisions of the judgment. We have likewise shown that Maxine Ellis Hardin asked Sam Dyer if he would deed the land back to her at the end of the 10 year period and he told her in emphatic language that he would not. He therefore knew that she was claiming an interest in the land and in effect had made a demand upon him for a return of her alleged interest therein. In any event, it has been held that where a tenancy in common is not acknowledged but denied and the tenant in exclusive possession, as is the case here, asserts claims and holds possession of the entire property under adverse claims in part at least thereto, the excluded cotenant, without demanding joint possession, may

recover for the use and occupancy of his or her part of the property. Buchanan v. Davis, Tex.Civ.App., 43 S.W.2d 279, adopted by the Supreme Court in Tex.Com. App., 60 S.W.2d 192; Vermillion v. Haynes, 147 Tex. 359, 215 S.W.2d 605; Autry v. Reasor, 102 Tex. 123, 108 S.W. 1162. These and many other authorities refute appellants' claims here made. Consequently appellants' Points 16, 17 and 18 are overruled.

■ Appellants' remaining Points 4 through 15, both inclusive, complain about the arguments appellees' counsel made to the jury and contend that such were improper. Before briefing these points, appellants admit in their brief that the provisions of Rules 434 and 503, Texas Rules of Civil Procedure, as construed by the courts of Texas now place the burden upon them to show from the record as a whole that any alleged improper and prejudicial arguments presented to the jury by opposing counsel were of such a nature that they amounted to such a denial of the rights of appellants as were reasonably calculated to cause and probably did cause the rendition of an improper judgment in this case. May we keep such in mind as we review these remaining points.

We have a lengthy record before us consisting of 430 pages in the statement of facts and 190 pages in the transcript, of which 33 pages are devoted to appellants' 12 bills of exception presented complaining about the arguments of opposing counsel. We likewise have before us an approved report of all of the arguments made by counsel on both sides consisting of 81 pages.

■ Argument of counsel generally before a jury is governed by Rule 269, Texas Rules of Civil Procedure, as construed by our courts. Counsel is required to confine arguments to the evidence heard and in reply to the arguments of opposing counsel. However, considerable latitude is allowed counsel in discussing the facts and issues in the case before a jury and counsel is permitted to draw legitimate inferences, deductions and conclusions from the evidence. Counsel may also make fair and reasonable criticism of a witness and his testimony when the record justifies such and he may comment upon bias or interest of parties and witnesses and may discuss the reasonableness or the unreasonableness of the evidence and he may reply to the arguments previously made by opposing counsel. What constitutes inflammatory and prejudicial argument by counsel in a case depends upon the facts and previous arguments made by opposing counsel in that case.

Appellants complain in Points 4 to 15, both inclusive, because the trial court refused to instruct the jury not to consider the arguments of opposing counsel as set out in 12 lengthy bills of exception. We shall not attempt to set out the contents of the bills of exception in full and will not discuss every phase of each complaint made but we shall endeavor to consider the merits of every complaint made even at the risk of making this opinion unduly lengthy.

■ Appellants complain first about the opening argument made before the jury over their objections by Hon. W. J. Lowe of appellees' counsel about the revenues received by Sam Dyer from the lands in question during the 10 year period from May, 1947 to May, 1957 when those matters had been previously determined by the trial court in a summary judgment. By their pleadings appellees in effect sought equity and pleaded that appellants had wrongfully received benefits from the land far in excess of what they paid for its use during the 10-year period in question. According to appellants' bill of exception, Mr. Lowe began his argument in question by saying "As I view the evidence" and proceeded to show from the evidence that there were approximately 2,230 acres of land involved, of which there were approximately 1,300 acres in cultivation and 900 acres in grass land upon which a computed rental value, according to the evi-

dence, exceeded more than $4,800 annually, when appellants objected and the trial court overruled their objection. In our opinion counsel had a right to indulge in a reasonable discussion of the evidence heard as he understood it whether such had any immediate bearing upon any issue submitted or not and the trial court properly overruled appellants' objections and request for instructions not to consider it. In any event no prejudicial error has been shown by reason of such argument.

■ In the same manner and with the same results appellants objected to an argument made by Hon. Ben Monning, Jr., concerning certain testimony heard. Maxine Ellis Hardin had testified that when she asked her uncle, Sam Dyer, if he was going to deed her interest in the land back to her, his exact reply was, "No, I am not going to give you a damn thing." When Sam Dyer was asked as a witness if he had made such a statement he said, "No, I did not say I wouldn't give her a damn thing, although I might have felt like it." Mr. Monning, while discussing that testimony in his argument, said over objections of appellants that it sounded to him like the expression Maxine said Sam Dyer used "was almost an automatic expression with him" and that if he made such a statement like his niece said he did, why would he not admit it; that he could tell from hearing him say such that he had probably used such an expression 500 times just like all of us form a habit of using such phrases. Appellants contend that Mr. Monning thereby gave unsworn testimony but Mr. Monning prefaced his arguments by "It sounded to me like * * *" and "I could tell from hearing him say * * *" thus making it appear from the language there used by counsel that he was merely drawing a deduction or expressing an opinion about the evidence heard. It has been held that counsel may draw reasonable inferences and deductions from facts and circumstances presented and may express reasonable opinions from them. Thornburg v. Manskey, Tex.Civ.App., 219 S.W.2d 720,

726; 41B Tex.Jur. 276, Sec. 235 and other authorities cited thereunder. Under the record and the law applicable thereto it is our opinion that the trial court was justified in concluding that counsel did no more in his argument than to draw reasonable deductions and inferences from the conflicting testimony. In any event no prejudicial error has been shown.

■ The same rules apply to the next complaint made by appellants about the further argument of Mr. Ben Monning, Jr. concerning a release of a deed of trust and vendor's lien Maxine Ellis Hardin signed at the local bank in connection with her dealings here involved with Sam Dyer. In his argument Mr. Monning said finally the matter was made clear by the testimony of Sam Dyer but they would not let Maxine relate it. "For some reason or other they wanted to conceal it. But, maybe, when you start out concealing something, you may just keep on concealing it." According to the record no objections were made to this argument by appellants at the time it was made but they have presented a point complaining about it and have stated in connection therewith that they are not separately "arguing" the point but are not waiving it. They did not brief that point separately but contend in their point that counsel for appellees was there discussing a matter that had been excluded by the trial court. If such argument constituted error, we think it could have probably been cured by an instruction of the trial court if appellants had objected at the time and have asked for an instruction but they did not, according to the record. In any event it has been said that " * * * counsel is permitted to state to the jury such facts as he, in good faith, draws from all of the circumstances of the case * * *" 41B Tex.Jur. 279. By reason of this authority and the others cited and by reason of the record before us, we find no reversible error committed by reason of the argument and complaints presented in this point.

■ Appellants charge error was committed by the closing argument of Hon. Ben

Monning, Sr., who said in effect that Col. Simpson said he had practiced law for 50 years but long before Simpson a law was passed that you couldn't take away from someone that is in your confidence and your blood kin anything of value without paying for it by a just and right consideration. We think the trial court was justified in holding that such did not constitute reversible error because it is admitted that Sam Dyer is Maxine Ellis' uncle. The evidence conclusively reveals and the trial court found that a fiduciary relationship existed between them and that Col. Simpson testified in effect that he told Maxine before she executed the deed in question that the consideration therein expressed was not enough value for the land in question. It also appears that counsel in his argument was probably referring either to the long and well recognized rule or law of justice or to the laws of a Supreme Being, to which Col. Simpson eloquently referred in his argument. In any event we think the argument challenged was a legitimate argument both from the record and in reply to previous arguments made by appellants' counsel, some of which will be later herein cited and discussed.

■ Appellants objected to the following closing argument made by Hon. Ben Monning, Sr.:

"You take that little niece, when she was on the stand, if I ever in my life ever saw a lady take as much punishment on cross examination, I don't believe I can remember it."

The trial court sustained the objection and immediately thereafter Mr. Monning withdrew his argument so made but, notwithstanding the fact that the trial court sustained the objection and appellees' counsel withdrew his argument, appellants present a point contending such constituted a prejudicial and an incurable error but after carefully considering the matter together with the record we do not think such constituted a reversible error.

Before discussing the remaining points we think it is advisable to review more of the record as briefly as possible. The record reveals that at or about the same time Col. Simpson prepared the deed in question in Amarillo he likewise prepared a lengthy affidavit for Maxine Ellis to sign before a notary public and to likewise be witnessed by three witnesses whose names Col. Simpson had written into the instrument (when he got to Clarendon one of the named witnesses could not be found and another witness was agreeably substituted therefor). It appears, upon an examination of that affidavit which covers 8 pages in the statement of facts, that it must have been drawn to bolster the language found in the deed in question that Maxine Ellis signed and acknowledged the same day. The language of the affidavit reveals that the witnesses to her signature thought the consideration for the land expressed in the deed was "a considerably less sum than its present market value." The record does not clearly disclose why the said affidavit was drawn or who authorized it to be drawn. Col. Simpson testified that he told Maxine he was going to draw an affidavit also and bring it with him to Clarendon, but Maxine Ellis Hardin testified in effect that she authorized the drawing of the deed in question but she did not authorize the drawing of the affidavit and did not know anything about it having been drawn until Col. Simpson brought it and the deed to Clarendon on the day she executed both of them before a notary public and the record shows she likewise signed the affidavit before the president and two vice presidents of the Farmers State Bank in Clarendon, Texas, as witnesses, which bankers therein stated that the market value of the land was greater than the consideration expressed in the deed. The record also shows that before any of the parties signed either of the instruments Col. Simpson read the affidavit in full in the presence of all of the parties and that Maxine Ellis willingly signed them both, although she was not well versed in business matters. According to her

testimony she did not mind binding herself fully in these instruments, since she had faith in her uncle, Sam Dyer, and in her oral agreement she had with him and she believed these instruments were being executed subject to the oral trust agreement between her and her uncle, Sam Dyer, which agreement her Uncle Sam had advised her not to mention to anybody. The record further reveals that the cross-examination of Maxine Ellis Hardin by Col. Simpson covers approximately 100 pages in the statement of facts and that Col. Simpson admonished her more than once either directly or indirectly to tell the truth or that she was testifying under oath but she stuck to her story and particularly to that part about the material facts upon which she based her claims here made. The record likewise reveals a copy of a letter Col. Simpson wrote to Sam Dyer of date May 6, 1947 (six days before the deed and affidavit were executed) saying he was sorry he was away from the office the day before and missed seeing Sam but his secretary gave him the message Sam left for him concerning the fact that his niece wanted to partition the land here involved. In the said letter Col. Simpson further advised against a partition at the time and said that to partition the land would require a lot of work and among other statements therein made he said, "It seems to me, Sam, that the best thing for us to do in the near future is to have a show-down conference with your niece." Col. Simpson further stated in substance that unless an understanding was had with the niece there would likely be trouble later.

In his argument to the jury Col. Simpson reviewed the contents of the affidavit in question and his letter to Sam Dyer. In order to compare parts of the argument made by appellants' leading lawyer in the case, Col. E. A. Simpson, with the arguments later made by Hon. Ben Monning, Sr., about which appellants complain, we shall quote excerpts from Col. Simpson's arguments as follows:

"Frankly, I wish this lawsuit had never happened. This is one piece of business that has been brought to me and tendered to me that I wish had never been offered to me, because I am awful close to Sam Dyer. The evidence shows that. I was awful close to his mother and sister. And, likewise, I was awful close to this fine girl. And, I don't have any animosity toward her even now * * *.

"And, for the last three days, since this trial has started, if any story ever preached by any Preacher to you is true, they (Maxine's mother and grandmother) have stood up behind the battlements of Heaven with tears running down their faces. Why? Because if what this fine girl charges Sam with is true, then Mrs. Dyer's boy and Elizabeth's brother has fallen so far below what he was when they knew him. If what she says is true, if he and that wife of his, as she said to me, maliciously, wickedly, designedly conceived the plan more than ten years ago, to steal her part of this land, then they are broken hearted that he has fallen so far below what they thought he was. On the other hand, if his story is true, and he never conceived that wicked scheme, if this girl has simply done the one human thing, *not a thief, not wickedly, not designedly, but has succumbed to human average,* (avarice) *influenced from outside points, and from some outside person, who has been her husband, but has remained silent at this trial, if she has happened to yield to human average,* (avarice) *and has charged her Uncle unjustly with these things, then her grandmother and her mother are saying,* 'Oh, daughter, daughter, granddaughter, granddaughter, your Uncle is not that kind of a thief, daughter. You were wrong in yielding to that *average* (avarice) in your mind and instituting that lawsuit' * * *.

"Oh, now, if Sam Dyer was a thief, and that is all he is if he is trying to perpetrate this scheme on her, if he is a swindler, blacker than ever came out of Hades, and if what she says is true, then what do you think he thought of me, when I wrote a letter to him, let her get her own lawyer and let's have a conference, because Sam, I fear that if she don't do it, and you do buy it, that you will be charged down the years with having over-reached her and influenced her improperly to her detriment? * * *

"Now, I will tell you what Mr. Monning is going to say in conclusion. He is going to say if something about that didn't stink, why did you write it like that? * * *

"I knew this was going to come. I was doing my dead level best to prevent it, but I didn't do enough. * *

"Now then, gentlemen, what else could a man do to be fair? Yet, before this is over with, I will be castigated in saying I knew it stunk. I knew this lawsuit was coming, and God knows I am sorry that my judgment was vindicated. But, it is here, and I was doing everything that I know. * * *

"Now then, I put it up to you. You can stamp him as the lowest creature that God ever created on earth, the commonest thief that slinks down the back alley, filching some cigarettes from a secret place, or a bottle of whiskey is a credit to him, if he has concocted this scheme they want you to believe that he concocted."

Continuing further appellants' complaints about the closing argument of Hon. Ben Monning, Sr., we find that, without any objections having been made by appellants at the time, Mr. Monning said:

"She (referring to plaintiff, Maxine Ellis Hardin) was on the stand for hours. I don't know how long it was, but it was a long time, and there were three lawyers right there, representing Old Sam. She had always been alone in this deal, alone, and there they are, three of them, ganging up on her, trying to make her say that Sam didn't agree to reconvey this thing back to her, but they never could. Her story was steadfast."

Although no objection was made at the time, appellants contend that this argument constituted incurable and reversible error, but under the record presented here we do not think so and doubtless if the trial court had thought so, it would have granted a new trial. 41B Tex.Jur. 262 and 263.

■ Appellants complain about the following closing argument made by Hon. Ben Monning, Sr., although no objections were made about it by appellants at the time.

"Let me tell you something. Just as sure as the world, if he had told her that he wasn't going to convey that back, (referring to the land in question) and she thought he wasn't going to live up to this ten year contract, she wouldn't have let many suns go down, because she knew he was getting something there that wasn't even the rental value of this land. I am telling you it was a diabolic steal."

Appellants contend that the argument although not objected to at the time constitutes incurable and reversible error, while appellees contend that the argument was proper and justified under the record and in reply to previous arguments made by appellants' counsel. In addition to the previously shown arguments made by appellants' leading counsel, Col. Simpson, another member of apellants' counsel, Hon. Cleo G. Clayton, Sr., made in part the following argument:

"Now, let's see if some of the action and conduct upon the part of Sam Dyer

evidenced the fact that he had larceny in his soul. Now, if he went out with a preconceived design to skin this girl out of this land, as the Plaintiff contends that they did, then I say to you, frankly, that he had larceny in his soul."

He, of course, then proceeded to defend the acts and conduct of his client. Mr. Monning contends that his argument thus made was justified under the record and was a proper reply being made to the previous argument of opposing counsel. However, Mr. Monning may have observed the rules of propriety a little better if he had used a milder or a less offensive expression that "diabolic steal" yet the term there used by Mr. Monning was milder and less harsh than some expressions used by appellants' counsel in describing their client, Sam Dyer, if he did what appellees' claimed he did. Under the record and in view of previous arguments made by opposing counsel, we do not believe any incurable and reversible error has been shown here.

Appellants further complain separately because the trial court overruled their objections to and refused to instruct the jury separately not to consider the following closing arguments made by Hon. Ben Monning, Sr.:

"Colonel Simpson said awhile ago, what else could he do? You heard him. I will tell you what you could have done, Colonel Simpson. You could have refused to say, 'I wo*nt* rob; I wo*nt* be a party to robbing this little niece; this Uncle Sam's own blood sister's offspring.' That is what you could have done. * * *

"All right. Now, come on down, after the mother died, he began ripening her for the kill. He is getting ready to bring her to the slaughter. He gives her a trip to Washington. All right. Then he gets that will. I am telling you that is one of the most diabolical things I ever saw in my life. Comes in here and get his niece that had a living father; a father that, according to this record in this case, gave her four or five years of college education. They come in here—* * *.

"And, Old Sam, according to the record, they said Old Sam didn't have any education. Well, I will tell you he ought to have had an education, if he didn't have one, because he ought to be smart enough to know that he couldn't get this property away from his niece without paying her a just price * * *.

"All right. Now then, we come on down to this affidavit, and to this letter that Colonel Simpson wrote. Now, ladies and gentlemen, I am telling you, I am telling you I know why Colonel Simpson wrote this letter. He wasn't writing this letter, don't be misled, he wasn't writing that letter to protect this little twenty-six year old girl, he was employed to protect that man, her uncle, and try to get a deed for as little money as he could get it for, so she couldn't break it * * *.

"Now, suppose Counsel Link, now he started off this way, gentlemen. Now, let's see if I am being fair about it. He says, 'some of you men have bought homes, have bought property, what are you going to do when you get a warranty deed? Now, how are you going to keep from getting sued?' Well, if you are being honest and not trying to rob your kinfolks, one that has confided in you, you are not going to get sued. But, I tell you the law is too free. When you get in there and do something that is wrong, dishonest, and not pay what is right, you ought to be sued."

After carefully examining appellants' separate points of error complaining about the foregoing closing argument of Mr. Monning, Sr., together with their bills

of exception, all in the light of the record in this case and in the light of the previous arguments made by appellants' counsel, and particularly that part of their arguments previously herein quoted, it is our opinion that no reversible error has been committed by reason of the arguments of appellees' counsel. In his argument Col. Simpson predicted the kind of closing argument Mr. Monning, Sr., would make and charged he would say appellants' acts "stinks", and further charged that if his client, Sam Dyer, was guilty of what appellees were charging him with, he, Sam Dyer, was a "thief" and "a swindler, blacker than ever came out of Hades" and several other such expressions, and thus laid a predicate for appellees' counsel to make such arguments as were made, but when Mr. Monning replied to the previous arguments made by Col. Simpson and his associates in milder and less harsh terms than Col. Simpson had predicted he would make, they objected to it. In our opinion the arguments made by opposing counsel in this case were very well balanced and appellants' should not have the case reversed because of the arguments of appellees' counsel. Davis v. Hill, Tex.Com.App., 298 S.W. 526; 41B Tex. Jur. 296–298 and 335–336; Corn v. Crosby County Cattle Co., Tex.Com.App., 25 S.W. 2d 290; Lowrimore v. Sanders, 129 Tex. 563, 103 S.W.2d 739; Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054; Texas & N. O. R. Co. v. Sturgeon, 142 Tex. 222, 177 S.W.2d 264; Aultman v. Dallas Ry. & Terminal Co., 152 Tex. 509, 260 S.W.2d 596; 41 Tex.Jur. 772, 773.

■ The trial court heard all of the pleadings, evidence and arguments of counsel and overruled all of appellants' complaints here made. It has been uniformly held in this state on the question of whether or not an argument of counsel is calculated to prejudice or injure the rights of an adverse party to the suit is addressed to the sound discretion of the trial court, with which a reviewing court will not interfere unless it is apparent that the trial court has abused its discretion. Burrow v. Davis, Tex.Civ.App., 226 S.W.2d 199; Texas Employers' Ins. Ass'n v. Sevier, Tex.Civ.App., 279 S.W.2d 473. In our opinion the trial court in the case at bar did not abuse its discretion in passing upon the questions complained about here. Consequently, appellants' Points 4 through 15, both inclusive, complaining about the arguments of appellees' counsel are all overruled.

In our opinion no reversible error was committed by the trial court but, assuming that error has been shown, the burden was then upon appellants to show from the record as a whole that such alleged error or errors committed by the trial court amounted to such a denial of the rights of appellants as were reasonably calculated to cause and probably did cause the rendition of an improper judgment. Rule 434. City of Galveston v. Hill, 151 Tex. 139, 246 S.W. 2d 860, 863; Mrs. Baird's Bread Co. v. Hearn, Tex., 300 S.W.2d 646, 650; Cloud v. Zellers, Tex., 309 S.W.2d 806, 808; Condra Funeral Home v. Rollin, Tex., 314 S.W. 2d 277, 280; State of Texas v. Parrish, Tex., 320 S.W.2d 330, 332. In the case at bar it is our opinion that appellants failed to discharge such burden and have not in any event shown that the alleged errors about which they complain here were reasonably calculated to cause and probably did cause the rendition of an improper judgment. For this reason the trial court's judgment should be sustained.

■ Appellees have presented four counterpoints under cross assignments of error charging first in effect that since appellants wrongfully held possession of the said land in question after the expiration of the 10-year period in question, they were not entitled to have an off-set of the farming expenses incurred that produced the gross proceeds therefrom and that there was no competent evidence heard establishing the true amount of such off-set in any event in determining appellees' interest in the revenues produced after the 10-year period expired. This matter was not sub-

mitted to the jury and no request was made for the submission of such to the jury, but the trial court made separate findings thereon in its judgment. We think there is sufficient evidence to support the trial court's findings there made in support of that part of its judgment, which findings are under the record binding on all parties. It is our opinion also that the trial court properly allowed the off-set complained about here and appellees first two cross assignments are overruled.

■■■ In their other two cross assignments appellees contend in effect that the pleadings and depositions showing that the Clarendon, Donley County town lots and the improvements thereon having been secured through fraud committed by appellants, the trial court erred in awarding appellants such property by reason of their motion for summary judgment and further contend that the prior summary judgment being interlocutory in nature the trial court erred under the record presented in not finally setting aside the summary judgment so entered and rendering judgment in all matters for appellees. The record twice reveals a copy of the trial court's summary judgment about which appellees here complain, one of date December 9, 1957 and the other of date April 2, 1958, while the trial court's final judgment in this action was entered June 19, 1959. We find nothing to indicate that the summary judgment twice entered was interlocutory in nature. Neither do we find from the record where appellees gave notice of appeals from such judgment or attempted to perfect an appeal therefrom. We also find from the summary judgment that the trial court there rendered judgment based upon evidence reflected by a deposition of Maxine Ellis Hardin and appellees likewise refer to the contents of a deposition in one of their cross assignments, but the record before us does not reveal any deposition or the contents of such. We therefore conclude that by reason of appellees' failure to perfect an appeal from the summary judgment, they should not now be heard to complain about it and we further conclude that no deposition nor the contents of such upon which the trial court based its summary judgment being before us, it is presumed that in any event the trial court had sufficient evidence before it to support its judgment. Appellees' other two cross assignments are therefore overruled.

A careful examination of the briefs and record, including arguments of counsel, reveals no reversible error in this case and in no event have appellants shown themselves entitled to have the judgment reversed because of Rule 434 as construed by decisions of the courts previously herein cited. Consequently, all points and counter assignments are overruled and the judgment of the trial court is affirmed.